**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Dominic SANTARELLI, Defendant-Appellant.**

**No. 84–5481.**

United States Court of Appeals, Eleventh Circuit.

Nov. 27, 1985.

Rosen & Rosen, P.A., E. David Rosen, Miami, Fla., for defendant-appellant.

Robert E. Lindsay, Donald W. Searles, Appellate Section, Dept. of Justice, Glenn L. Archer, Jr., Asst. Atty. Gen., Tax Div., Michael L. Paup, Chief, Appellate Section, U.S. Dept. of Justice, Washington, D.C., for plaintiff-appellee.

Before TJOFLAT and HENDERSON, Circuit Judges, and NICHOLS *, Senior Circuit Judge.

TJOFLAT, Circuit Judge:

## I.

On August 15, 1980, a grand jury sitting in the Southern District of Florida returned an eight-count indictment against Dominic Santarelli, the appellant, Joan Santarelli, his sister-in-law, and Frank Ammirato. Count one charged the defendants with conspiracy to use extortionate means to collect extensions of credit made to Michael C. Abbate and other persons, in violation of

---

* Honorable Philip Nichols, Jr., U.S. Circuit Judge for the Federal Circuit, sitting by designation.

18 U.S.C. § 894 (1982).[1] Counts two through six charged the defendants with substantive violations of section 894. Counts seven and eight charged Dominic Santarelli with subscribing to income tax returns containing false statements for the years 1974 and 1975, in violation of 26 U.S.C. § 7206(1) (1982).[2] On the date of the indictment, Ammirato was in federal custody on another charge; he was arraigned three days later and was denied bail. Dominic and Joan Santarelli became fugitives from justice.

On November 29, 1980, Joan Santarelli was arrested; she was arraigned thirteen days later. On January 26, 1981, she and Ammirato went to trial. After the jury was sworn, the court excused the jury and held a *James* hearing.[3] *See United States v. James*, 590 F.2d 575 (5th Cir.) (en banc), *cert. denied*, 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979).[4] At the conclusion of the hearing, the court dismissed the indictment as to both defendants.[5]

On July 18, 1981, Dominic Santarelli was expelled from the Dominican Republic and upon his return to the United States was arrested at Miami International Airport pursuant to a warrant issued on the indict-

ment in this case. A United States Magistrate arraigned him on July 20, and the following day the district court scheduled his trial for September 3, 1981. Prior to trial, Santarelli moved the court to suppress various items of evidence agents of the Federal Bureau of Investigation had obtained from his home in Ft. Lauderdale, Florida on September 26, 1975, pursuant to a search warrant. The district court referred the motion to a magistrate. After an evidentiary hearing, the magistrate filed a report recommending that the district court deny the motion. The court accepted the report and recommendation and denied the motion.

Dominic Santarelli went to trial before a jury on September 28, 1981. At the conclusion of the Government's case in chief, he moved for a judgment of acquittal on all eight counts of the indictment. The court granted his motion as to counts two through six but allowed count one, the conspiracy count, and counts seven and eight, the false tax return counts, to be considered by the jury. On October 6, 1981, the jury returned guilty verdicts as to counts seven and eight and a not guilty verdict as to count one. On June 7, 1984,[6]

---

1. 18 U.S.C. § 894 (1982) provides in relevant part:

   **§ 894. Collection of extensions of credit by extortionate means**
   (a) Whoever knowingly participates in any way, or conspires to do so, in the use of any extortionate means
   (1) to collect or attempt to collect any extension of credit, or
   (2) to punish any person for the nonrepayment thereof,
   shall be fined not more than $10,000 or imprisoned not more than 20 years, or both.

2. 26 U.S.C. § 7206(1) (1982) provides:

   **§ 7206. Fraud and false statements**
   Any person who—
   **(1) Declaration under penalties of perjury**
   Willfully makes and subscribes any return, statement, or other document, which contains or is verified by a written declaration that it is made under the penalties of perjury, and which he does not believe to be true and correct as to every material matter ... shall be guilty of a felony and, upon conviction thereof, shall be fined not more than $100,000 ($500,000 in the case of a corporation), or

imprisoned not more than 3 years, or both, together with the costs of prosecution.

3. A *James* hearing is a prophylactic procedure fashioned by this circuit to enable a district court to determine in advance of trial, before the jury is sworn and jeopardy attaches, the admissibility of coconspirator statements to prove the truth of the matter asserted. *See* Fed.R.Evid. 801(d)(2)(E). If a *James* hearing is held after jeopardy attaches, the Government is precluded from obtaining appellate review of an adverse ruling. *See* 18 U.S.C. § 3731 (1982).

4. In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

5. The record of the *James* hearing is not before us; therefore, we do not know the rationale for the district court's dismissal of the indictments as to these defendants.

6. The following events contributed to the excessive delay (32 months) between the return of the jury's verdict and Santarelli's sentencing. On

the district court sentenced Santarelli to concurrent two-year terms of imprisonment and a $10,000 fine, and Santarelli appealed.

Santarelli presents two claims of error. First, he contends that the district court erred in admitting into evidence the items the FBI obtained during the search of his home on September 26, 1975. Second, he contends that the district court erred in denying a requested jury instruction. We address these contentions *seriatim*.

## II.

### A.

The FBI's search of Santarelli's Ft. Lauderdale residence took place pursuant to a warrant issued the same day on the basis of an FBI agent's affidavit. In the affidavit, Special Agent Elie T. Scott described Santarelli as a "loan shark" who had been operating a loansharking business out of his residence for several years. Agent Scott based his description of Santarelli's illicit activity on information he had received from one of Santarelli's borrowers, Michael C. Abbate, from other FBI agents, and from a September 19, 1975 telephone conversation between Abbate and Santarelli which Abbate permitted him to monitor.

According to Agent Scott's affidavit, Abbate borrowed large sums of money from Santarelli, in a series of loans totaling in excess of $350,000, between the fall of 1971

October 12, 1981, six days after the verdict was returned, Judge Alcee L. Hastings, who had presided over the case from its inception, recused himself in all cases, pending a grand jury investigation in the Southern District of Florida. That investigation resulted in Judge Hastings' indictment, *United States v. William A. Borders, Jr., and Alcee L. Hastings*, Case No. 81–596–CR–EBD, on December 29, 1981, and Judge Hastings performed no judicial functions until he was found not guilty of the charges contained in the indictment on February 4, 1983, following a two-week jury trial.

On October 16, 1981, the clerk of the district court, pursuant to 28 U.S.C. § 137 (1982) and local court rules, transferred Santarelli's case to Judge Norman C. Roettger. On October 23, 1981, Santarelli moved for a new trial; Judge Roettger stayed further proceedings in the case so that a trial transcript could be prepared. He lifted the stay *sua sponte* on May 22, 1982, and ordered the Government to respond to the motion for new trial. The Government filed its response on June 14, 1982. The court thereafter requested additional memoranda from the parties on the merits of Santarelli's motion for new trial and, on January 13, 1983, denied the motion and scheduled Santarelli's sentencing for February 24, 1983. On February 8, Judge Roettger continued the sentencing hearing to March 7, 1983.

On February 17, 1983, Santarelli moved Judge Roettger to reassign the case to Judge Hastings. On February 18, the Government served notice of its intention to rely on *Fatico*-type evidence concerning Santarelli's criminal background at sentencing. *See United States v. Fatico*, 603 F.2d 1053 (2d Cir.1979), *cert. denied*, 444 U.S. 1073, 100 S.Ct. 1018, 62 L.Ed.2d 755 (1980). On March 4, Santarelli moved Judge Roettger, in separate motions, to continue the March 7 sentencing and to stay further proceedings in the case. Judge Roettger, in a memorandum order entered March 4, denied both of these motions and Santarelli's February 17 motion to reassign the case to Judge Hastings. Santarelli immediately petitioned this court for a writ of prohibition preventing Judge Roettger from sentencing him and moved this court to stay the March 7 sentencing hearing pending our disposition of his petition. We denied the petition and the motion for a stay on March 7.

The defendant was not sentenced on March 7. On March 28, 1983, the clerk of the court issued a notice that Judge Hastings would sentence Santarelli on April 21, 1983. On April 11, 1983, Judge Roettger entered an order nunc pro tunc, with an effective date of March 11, 1983, reassigning the case to Judge Hastings. On April 11, 1983, Santarelli moved Judge Hastings to hold a "pre-sentence *in camera* hearing." The court continued the sentencing hearing scheduled for April 21 pending its disposition of Santarelli's motion. On June 14, 1983, Judge Hastings granted Santarelli's motion, stating that he would convene an *in camera* hearing on June 24, to permit Santarelli to contest the contents of the presentence investigation report that had been prepared by the court's probation officer. That hearing was held as scheduled. At the hearing, the court stated that the Government would be allowed to present its *Fatico* evidence at an *in camera* hearing on August 15, 1983. The Government moved the court, on June 30, to reconsider its decision to proceed *in camera*, and, on July 13, the court denied the motion. On August 5, 1983, the Government sought a writ of mandamus in this court, challenging Judge Hastings' authority to exclude the public from an adversarial *Fatico* sentencing hearing. The appeal was dismissed on April 16, 1984, *United States v. Santarelli*, 729 F.2d 1388 (11th Cir.1984), and, on June 7, 1984, Santarelli was sentenced.

and the date of the affidavit. The interest rates on these loans were either five or ten percent per week (i.e., 260 or 520 percent per annum). Abbate obtained these loans and made payments thereon at Santarelli's Ft. Lauderdale residence. The payments were made either to Santarelli, Joan Santarelli, or to loan collectors Frank Ammirato or Philip Damiano. In time, Abbate fell behind in his payments. Santarelli warned Abbate that further delays in making payment would lead to serious injury to Abbate and his family. Santarelli told Abbate that he had murdered five men who had defaulted on their loans and displayed a shotgun and other firearms at his home which he claimed were used to deal with delinquent borrowers. On August 19, 1975, Abbate went to Santarelli's residence to renegotiate the terms of his loan payments. On being advised of the purpose of the visit, Santarelli, to impress upon Abbate the importance of making his payments on time, told Abbate that he had recently murdered his confederate, Philip Damiano, because Damiano had failed to turn over some money he had collected for Santarelli. (The Ft. Lauderdale police subsequently advised the FBI that they had found Damiano's body in a parking lot with bullet holes in the back of the head on August 11, eight days prior to Santarelli's statement to Abbate.) Santarelli showed Abbate a brown cowhide wallet, a gold ring with a diamond setting, and a gold faced, gold banded wrist watch, which Abbate recognized as belonging to Damiano, and said that if Abbate did not keep his payments current he would have Abbate killed.

On September 17, 1975, Santarelli ordered Abbate to take out a $100,000 life insurance policy, with Abbate's wife as beneficiary, and have her assign her interest in the policy to Santarelli. Santarelli had previously caused Mrs. Abbate to assign to him her interest in two insurance policies on Abbate's life: a $50,000 policy issued by Security of Connecticut Life Insurance Company and a $100,000 policy issued by Guarantee Trust Life Insurance Company of Chicago.

On September 19, 1975, Abbate, at Agent Scott's request, telephoned Santarelli at Santarelli's Ft. Lauderdale residence and authorized Agent Scott to monitor the call. During the course of the ensuing conversation, Santarelli told Abbate to bring the "cabbage," i.e., cash, to Santarelli's house as Abbate had always done.

Agent Scott's affidavit was presented to a magistrate of the Southern District of Florida on September 26, 1975, and the magistrate issued the search warrant in question. The magistrate concluded that the affidavit demonstrated probable cause to believe that Santarelli's residence contained various items that were being used to violate, or that constituted evidence of the violation of, 18 U.S.C. §§ 892–894 (1982),[7] and he authorized any special agent of the FBI or any other authorized law enforcement officer to seize them. Some of these items had been mentioned with specificity in Agent Scott's affidavit, and the magistrate repeated the descriptions in the warrant. These items were: "United States currency, promissory notes, life insurance policies, documents of assignment of life insurance policy proceeds, one brown cowhide wallet with attached notes and papers, one gold ring with diamond setting, and one wrist watch with gold face and gold band." The warrant also authorized the seizure of

> all property constituting evidence of the crimes of making and conspiring to make extortionate extensions of credit, financing extortionate extensions of credit, and collections of and conspiracy to collect

7. These three statutes cover three activities related to extortionate credit transactions. Section 892 makes it a crime to engage in extortionate extensions of credit. 18 U.S.C. § 892 (1982). Section 893 makes it a crime to advance money or property as a gift, as a loan, or as an investment to any person when reasonable grounds exist to believe that it is the intention of that person to make extortionate extensions of credit. 18 U.S.C. § 893 (1982). Section 894 makes it a crime to use extortionate means to collect extensions of credit or to punish any person for failure to repay. 18 U.S.C. § 894 (1982) (the relevant text of section 894 is reprinted *supra* note 1).

extortionate extensions of credit which are being kept there in violation of Title 18, United States Code, §§ 892, 893 and 894.[8]

During the search, the agents seized forty-four separately described items from Santarelli's upstairs bedroom which included weapons, ammunition, address books, ledgers, index cards with notations, promissory notes, miscellaneous business and investment records, a wallet, and a gold watch. The agents also seized the contents of a four-drawer filing cabinet located in the hallway closet adjoining the bedroom. These contents included additional index cards with notations, life insurance policies, documents assigning life insurance policy proceeds (including a policy on Michael Abbate), federal income tax returns, bank statements, and business and investment records.

After completing their search of Santarelli's residence, the agents took the items they had seized, which filled eight large cardboard boxes, to the local FBI office to prepare an inventory and determine which items were covered by the warrant. They apparently did so because of the prolonged period it would have taken them to perform this task at the residence.

### B.

Santarelli contends that the district court erred in refusing to suppress items seized in this search. He objects, in particular, to the admission into evidence of desk-top calendars for the years 1972, 1973, and 1975, and several index cards and slips of paper, all bearing notations relating to interest payments. It is undisputed that this evidence was indispensible to the Government's claim that Santarelli received interest income that he had not reported in his

1974 and 1975 federal income tax returns.[9] These documents are not specifically described in the search warrant, but it is clear that they fall within the last clause of the warrant authorizing the seizure of "all property" constituting evidence of loansharking.[10] Santarelli contends that the language of this clause is overbroad, thereby rendering the warrant invalid as a "general warrant." We disagree.

The fourth amendment requires that warrants be issued only when they "particularly describ[e] the place to be searched, and the persons or things to be seized." U.S. Const. Amend. IV. We have held in the past that a description is sufficiently particular when it enables the searcher reasonably to ascertain and identify the things to be seized. *United States v. Betancourt*, 734 F.2d 750, 754–55 (11th Cir.), *cert. denied*, —— U.S. ——, 105 S.Ct. 440, 83 L.Ed.2d 365 (1984); *United States v. Wuagneux*, 683 F.2d 1343, 1348 (11th Cir. 1982), *cert. denied*, 464 U.S. 814, 104 S.Ct. 69, 78 L.Ed.2d 83 (1983). There are circumstances in which the law enforcement officer applying for a warrant cannot give an exact description of the materials to be seized even though he has probable cause to believe that such materials exist and that they are being used in the commission of a crime. In these situations we have upheld warrants when the description is as specific as the circumstances and the nature of the activity under investigation permit. *See United States v. Blum*, 753 F.2d 999, 1001 (11th Cir.1985); *Wuagneux*, 683 F.2d at 1349.

In the case at hand, the affidavit supporting the warrant provided probable cause to believe that Santarelli was conducting a loansharking business in his

---

**8.** The original warrant and supporting affidavit authorizing the search of appellant's residence is not contained in the record before us. Apparently, these documents were lost prior to the suppression hearing. The parties, however, agree that the description in the text accurately reproduces the original warrant's language.

**9.** Because appellant was acquitted on the conspiracy count, the admission into evidence of

items seized in the search that were irrelevant to the tax evasion counts constituted, at worst, harmless error. We focus, therefore, only on the items relevant to the false tax return counts which were admitted into evidence at trial.

**10.** For the exact language of the last clause of the warrant, refer to text *supra*.

home. Although the affiant, acting on the information given by the informant, Abbate, was able to describe several items in Santarelli's home, he could not have known precisely what other evidence of loansharking the residence contained. The only evidence a loansharking operation could generate would be business records, such as internal accounting documents showing loans outstanding, interest due, and payments received. Prior to entering Santarelli's residence, however, the agents could not have known that Santarelli's loansharking records would have consisted of notations on index cards, calendars, and slips of paper scattered about his bedroom.[11]

Several circuits have upheld broadly-worded search warrants authorizing the seizure of loansharking evidence under similar circumstances. In *United States v. Dennis*, 625 F.2d 782, 792 (8th Cir.1980), the Eighth Circuit upheld a warrant authorizing the seizure of " 'certain books and records (or items of evidence)' " relating to a loansharking operation. The court found that this general description sufficed because the exact identity of the evidence to be seized could not have been known at the time the warrant issued and because the warrant limited the search to evidence of loansharking. Similarly, in *United States v. Timpani*, 665 F.2d 1, 4–5 (1st Cir.1981), the First Circuit upheld a warrant authorizing the seizure of " 'any and all records relating to extortionate credit transactions (loansharking)' " because, the court concluded, the search warrant could not have been made more precise.

■ Here, the final clause of the warrant used the broad phrase "all property" but limited the seizure to items that constituted evidence of loansharking. While, in hindsight, it might have been more accurate for the magistrate to have used the term "all business records" rather than "all property," we believe that, by limiting the search to evidence of loansharking operations, he necessarily limited the search to business records. In sum, because there is no evidence that the FBI had additional information that would have allowed the warrant applicant to give a more particularized description of the loansharking evidence located in Santarelli's residence, we follow the reasoning in *Dennis* and *Timpani* and conclude that the warrant satisfied the particularity requirement of the fourth amendment.

Santarelli contends, alternatively, that, even if the warrant was sufficiently particular, the search itself exceeded the authority granted in the warrant and, therefore, all the evidence seized should have been suppressed. In essence, he objects to the methodology of the search which, as we have recounted, entailed the removal of large numbers of documents from Santarelli's residence for careful examination at another location. In an effort to show the unreasonableness of the search, Santarelli points to the large number of documents that were removed and to specific items, such as Disney World tickets and children's report cards, that were clearly unrelated to loansharking activity. For the reasons that follow, we reject Santarelli's argument and conclude that the district court was correct in denying the motion to suppress.

■ In *United States v. Wuagneux*, 683 F.2d at 1352, we recognized that "the magnitude of a search is insufficient, by itself, to establish a constitutional violation; rather, the relevant inquiry is whether the search and seizures were reasonable under all the circumstances." The search here was limited to Santarelli's upstairs bedroom and an adjoining hallway. The vast majority of the items seized were found in his desk and in a four-drawer filing cabinet. Given the fact that the search warrant entitled the agents to search for documents, i.e., records of loansharking activity, insurance policies, and promissory notes, it is clear that the agents were enti-

---

**11.** The items admitted into evidence relating to the filing of false tax returns—calendars, index cards, and slips of paper—were found exclusively in Santarelli's bedroom. Other index cards and calendars were found in a filing cabinet in a hallway closet, but these items were not admitted into evidence at trial.

tled to examine each document in the bedroom or in the filing cabinet to determine whether it constituted evidence they were entitled to seize under the warrant. *See United States v. Slocum,* 708 F.2d 587, 604 (11th Cir.1983) (in a search of documents a brief perusal is necessary in order for police to perceive the relevance of the documents to the crime). It follows that Santarelli would have no cause to object if the agents had entered his home to examine the documents and remained there as long as the search required. The district court estimated that a brief examination of each document would have taken several days. Under these circumstances, we believe that the agents acted reasonably when they removed the documents to another location for subsequent examination. Given that the officers were entitled to examine the documents while they remained in the home, we cannot see how Santarelli's privacy interest was adversely affected by the agents' examination of the documents off the premises, so long as any items found not to be relevant were promptly returned. Indeed, as we previously found in *Wuagneux,* 683 F.2d at 1353, to require an on-premises examination under such circumstances would significantly aggravate the intrusiveness of the search by prolonging the time the police would be required to remain in the home. We find, therefore, that the search of Santarelli's residence was reasonable.

Thus, because we have found that the search warrant in question described the items to be seized with sufficient particularity and that the search of Santarelli's residence itself was reasonable, we conclude that the district court correctly denied the motion to suppress.

### III.

Santarelli also contends that the district court erred in denying a requested jury instruction related to the calculation of interest income on his tax returns. At trial, he introduced evidence tending to prove that the recipient of the loans described by the evidence, Michael Abbate, was insolvent during the tax years in question and argued that he was entitled to treat all of Abbate's payments as return of principal rather than as taxable interest income. Santarelli requested that the district court instruct the jury as follows:

> If the jury finds that the witness, Abbate, in the years 1974 and 1975 was insolvent or that the repayment of the debt involved herein was in such a questionable state, then the repayments of any amounts shall first be applied to principal and any balance, if any, shall be applied to interest. If there is no balance, the jury must find the defendant not guilty on Counts VII and VIII.

The court denied Santarelli's request.

The district court's refusal to deliver the requested instruction constitutes reversible error "only if the requested instruction (1) [was] correct, (2) [was] not substantially covered by other instructions which were delivered, and (3) deal[t] with some point in the trial so 'vital' that the failure to give the requested instruction seriously impaired the defendants' ability to defend." *United States v. Stone,* 702 F.2d 1333, 1339 (11th Cir.1983) (per curiam). Because we find that the instruction was not a correct statement of the law, we need not address the last two elements of the test.

Santarelli contends that the Supreme Court's decision in *Burnet v. Logan,* 283 U.S. 404, 51 S.Ct. 550, 75 L.Ed. 1143 (1931), stands for the general proposition that, when the fair market value of property held for the production of income cannot be determined with reasonable certainty, the owner of the property may consider all payments to be returns of capital until he recoups his investment. Given Abbate's weak financial condition, Santarelli argues that he was entitled to consider all payments from Abbate as repayment of principal until the debt was extinguished.

If Santarelli could show that, at the time he received the payments from Abbate he considered the payments to be repayments of principal, we believe that *Burnet* would be controlling. The evidence adduced at

trial, however, supported a finding by the jury that Santarelli considered the payments to be interest payments. The records found in Santarelli's bedroom office documented the amount of money Abbate paid and the amount of the debt still outstanding. In isolated instances Abbate's payment correlated with a reduction in his debt.[12] In most instances, however, the payment did not reduce the amount of the debt, permitting the inference that Santarelli treated the payment as interest.

Santarelli contends that, regardless of his previous method of accounting for Abbate's payments, he was entitled to treat the payments as repayments of principal upon a showing that Abbate was insolvent. We reject this argument and hold that Santarelli could not avoid prosecution under 26 U.S.C. § 7206(1) (1982) simply by changing his accounting method on the eve of trial. A contrary rule would make a mockery of the federal income tax system.

Our holding is supported by the decision of the Ninth Circuit in *United States v. Miller,* 545 F.2d 1204 (9th Cir.1976), *cert. denied,* 430 U.S. 930, 97 S.Ct. 1549, 51 L.Ed.2d 774 (1977). In that case, the taxpayer argued that $197,000 he received from his close corporation was not gross income but a constructive corporate distribution to a shareholder. Because the corporation had no earnings or profits for the year, the taxpayer argued that the $197,-000 represented a return of capital and therefore had no tax consequences. The court found that because the taxpayer, upon receiving the funds, did not "report such funds as income or ... make any adjustments in the corporate books to reflect a return of capital, he ... violated the tax evasion statutes." *Id.* at 1214 n. 12. In essence, the court looked to the taxpayer's initial characterization of the payment and refused to allow the taxpayer to present a new accounting theory at trial: "To hold otherwise would be to permit the taxpayer to divert such funds and if not caught, to later pay out another return of

capital; or if caught, to avoid conviction by raising the defense that the sums were a return of capital and hence non-taxable." *Id.* at 1215. Similarly, Santarelli did not report Abbate's payments as interest income or account for them in his records as repayment of principal. Under these circumstances, we believe that the determination of whether Abbate's payments should be treated as interest income or as repayment of principal was an issue for the jury.

The jury instruction Santarelli requested would have required the jury to treat all of Abbate's payments as repayments of debt. This instruction simply was not a correct statement of the law; the jury was entitled to examine the evidence and to determine whether the payments represented interest income or return of principal. Thus, we conclude that the district court was correct in denying Santarelli's requested instruction.

The judgment of the district court is, accordingly,

AFFIRMED.

**12.** These payments were not included in the calculation of Santarelli's interest income for the years 1974 and 1975.