STATE OF MINNESOTA

IN SUPREME COURT

A24-1463

Saint Louis County                                                                    Hudson, C.J.

State of Minnesota,

        Respondent,

vs.                                                                    Filed:  February 25, 2026
                                                                       Office of Appellate Courts

Deshon Israel Bonnell,

        Appellant.

_____

Keith Ellison, Attorney General, Thomas R. Ragatz, Assistant Attorney General, Saint Paul, Minnesota; and

Kimberly J. Maki, Saint Louis County Attorney, Duluth, Minnesota, for respondent.

Cathryn Middlebrook, Chief Appellate Public Defender, Saint Paul, Minnesota; and

Paul J. Maravigli, Special Assistant State Public Defender, Minneapolis, Minnesota, for appellant.

_____

S Y L L A B U S

    1.    A sender of an electronic message does not retain a reasonable expectation of privacy in the digital copy of the received message that is stored in the recipient's separate and independent account or device.

    2.    Appellant's Fourth Amendment and state constitutional protections were not triggered when the law enforcement officers searched his accomplices' Facebook accounts because appellant claims no ownership interest in those accounts and he did not retain a

1

legitimate expectation of privacy in the electronic messages he sent to his accomplices after the messages were received and stored in his accomplices' Facebook accounts.

3. Appellant's Fourth Amendment and state constitutional protections were violated by law enforcement's searches of his two Facebook accounts because the warrant authorizing the searches of his two Facebook accounts lacked any temporal or subject-matter limitations.

4. Although the district court erred when it failed to suppress the evidence collected exclusively during the search of appellant's two Facebook accounts and when it later admitted that evidence at trial, the errors were harmless beyond a reasonable doubt because the jury's verdict was surely unattributable to the errors.

5. Assuming without deciding that the district court abused its discretion by admitting the contents of constitutionally obtained social media messages pursuant to the immediate episode and *Spreigl* exceptions to Minnesota Rule of Evidence 404(b), the errors were harmless because they did not significantly affect the verdict.

6. When viewed in a light most favorable to the verdict, the corroborative evidence was weighty enough to restore confidence in the truth of the accomplice's eyewitness testimony that appellant fatally shot the decedent, and the State presented sufficient evidence to support appellant's conviction.

Affirmed.

O P I N I O N

HUDSON, Chief Justice.

Appellant Deshon Israel Bonnell directly appeals his conviction of first-degree premeditated murder for the shooting death of Joshua LaValley. On appeal, Bonnell makes six arguments. First, he argues a sender of an electronic message retains a reasonable expectation of privacy in the digital copy of the received message that is stored in the recipient's separate and independent account or device. Second, he argues officers violated his Fourth Amendment and state constitutional protections when they searched the separate and independent Facebook accounts of his accomplices, which contained digital copies of electronic messages he sent to his accomplices that were received and stored in their accounts. Third, Bonnell argues officers violated his Fourth Amendment and state constitutional protections when they searched his two Facebook accounts. Fourth, he argues the district court committed harmful error when it admitted the evidence collected from the accomplice's Facebook accounts and his two Facebook accounts at trial. Fifth, he argues the district court committed harmful error when it admitted evidence of prior bad acts at his trial in violation of Minnesota Rule of Evidence 404(b)(1). Sixth, Bonnell argues the direct eyewitness testimony of his accomplice, who testified that she saw Bonnell shoot the victim, was not adequately corroborated and that the evidence was insufficient to support his conviction.

We conclude, as a matter of first impression, that a sender of an electronic message does not retain a reasonable expectation of privacy in the digital copy of the received message that is stored in the recipient's separate and independent account or device. We

3

further conclude that Bonnell's Fourth Amendment and state constitutional protections were not triggered when an officer searched his accomplices' Facebook accounts because Bonnell claims no ownership interest in those accounts and because he did not retain a legitimate expectation of privacy in the electronic messages he sent to his accomplices after the messages were received and stored in his accomplices' Facebook accounts. We also conclude, however, that Bonnell had a reasonable expectation of privacy in the digital copies of the sent messages that were stored in his two Facebook accounts, and therefore the searches of his two Facebook accounts triggered his federal and state constitutional protections. And Bonnell's Fourth Amendment and state constitutional protections were violated by the officer's searches of his two Facebook accounts because the warrant authorizing the searches of his Facebook accounts lacked any temporal or subject-matter limitations.

Nevertheless, we conclude that the district court's failure to suppress the evidence collected exclusively from the searches of Bonnell's two Facebook accounts and its erroneous admission of that evidence at trial were harmless beyond a reasonable doubt because the jury's verdict was surely unattributable to the errors. In addition, although we assume without deciding that the district court erred when it admitted the contents of social media messages—which were constitutionally obtained from accomplices' Facebook accounts—pursuant to the immediate episode and *Spreigl* exceptions to Minnesota Rule of Evidence 404(b)(1), we conclude that the errors were harmless because they did not significantly affect the verdict.

4

Finally, we conclude that when viewed in a light most favorable to the verdict, the corroborative evidence was weighty enough to restore confidence in the truth of the accomplice's eyewitness testimony that Bonnell fatally shot the decedent, and therefore the State presented sufficient evidence to support Bonnell's conviction. Based on our conclusions, we affirm.

**FACTS**

On January 6, 2019, a man snowmobiling on the Mesabi Trail in Saint Louis County found a dead body lying in the snow. The snowmobiler immediately called 911, and the law enforcement officers who arrived on the scene identified the decedent as Joshua LaValley. When crime-scene analysts and officers from the Minnesota Bureau of Criminal Apprehension (BCA) arrived at the scene, they found a shoe print in the snow with a distinctive circular tread on the sole.[1] They also found one spent .22-caliber bullet casing near the body. A medical examiner determined that LaValley died from two bullet wounds to the face, one to his right jaw and one to the right side of his nose.

The next day, officers found LaValley's car parked outside Bailey French's house. After staking out the vehicle, officers observed a man enter the vehicle and drive it a short distance, at which point they approached the man and identified him as Anthony Howson.

---

[1]     The distinctive circular tread is significant because accomplice Bailey French testified at trial that before going out onto the Mesabi trail where she personally witnessed Bonnell fatally shoot LaValley twice in the face, she and accomplice Anthony Howson switched shoes so she could walk more easily in the snow. In addition, a police officer testified that the distinctive circular tread in the shoe print found at the scene matched the sole of a pair of Osiris shoes found in Howson's house. Howson testified at trial that on the night of the murder he lent the Osiris shoes to French so she could walk with Bonnell in the snow.

5

The officers discovered LaValley's EBT card on Howson during a search. Officers returned to French's house and discovered that Bonnell and his girlfriend, Bailey French, were inside. The officers asked Bonnell and French to step outside.

After Bonnell stepped outside, two officers directed him to sit in the passenger seat of their squad car, where they conducted an on-scene interview. At the start of the interview, the officers told Bonnell that they did not know if he was connected to the crime, but they did know he had "probably" been "speaking with . . . an individual," Howson, whom they suspected was involved. As part of the interview, Bonnell confirmed that he and French were dating. He also asserted that he was heavily intoxicated on the night of the murder and did not remember anything that happened. The officers repeatedly told Bonnell that he was free to leave the car if he wanted to, and he eventually did so.[2]

While officers interviewed Bonnell, two other officers interviewed French. French went into detail about the killing, identified Bonnell as "Pineapple," and indicated that she and Bonnell texted and sent messages through social media on the night of the murder. In a separate interview with law enforcement officers, Howson also admitted to taking part in the murder and to using Facebook Messenger to communicate with Bonnell and French that night.

After his on-scene interview, Bonnell, who lived with his mother, went home. Thirty minutes later, officers arrived at his mother's house, arrested him, and read him his

---

[2]     Immediately after Bonnell stepped out of the car, the agents seized Bonnell's cell phone without a warrant. Bonnell does not contest the seizure of his cell phone on appeal. Moreover, the police never tried to search the contents of Bonnell's cell phone.

6

*Miranda* rights for the first time. Bonnell requested an attorney, and the officers did not question him further. Bonnell's mother, however, allowed the officers to enter and search the house. On top of the fridge, the officers located a brown paper bag that had the words ".22 Ruger pistol" written on it. There was no gun inside the bag, but there was .22-caliber ammunition. The officers also located spent .22-caliber ammunition in Bonnell's bedroom in the basement of the house.

The officers later sought and received a warrant to search French's home, where they found a Ruger .22-caliber pistol under the mattress in one of the bedrooms. BCA analysts subsequently tested the pistol for fingerprints and DNA, and compared the spent casing found at the scene to a casing test-fired from the pistol found in Bonnell's home. The BCA fingerprint analyst testified that she found a fingerprint above the trigger of the gun that matched French, but did not find fingerprints matching Bonnell. The BCA DNA analyst testified, however, that she found a mixture of DNA profiles on the gun. On the magazine, she found a mixture of four or more people's DNA, and the major male profile matched Bonnell's profile. On the trigger, she found a mixture of three or more people's DNA, and the major male profile also matched Bonnell's. She was not provided with French's or Howson's DNA profiles and was unable to confirm whether their DNA matched the DNA on the gun. The BCA firearms analyst testified at trial that the spent cartridge found in Bonnell's basement bedroom came from the pistol.

In February 2019, a law enforcement officer applied for a single warrant authorizing the officer to search 12 separate Facebook accounts, five of which are relevant here. The first relevant account was owned by French, and the second and third relevant accounts

7

were owned by Howson. The fourth and fifth relevant accounts were purportedly owned by Bonnell (including an account named "Pineapple Man"). For each Facebook account, the warrant application sought "[a]ll contact information," "[a]ll Photos or videos," "[a]ll Neoprints, including profile contact information," "[a]ll activity logs," "[a]ll other records of communications made or received by the users or between users," and "[a]ll IP logs." The warrant did not provide time or date ranges for the records. The probable cause statement in the warrant application described the discovery of LaValley's body and that LaValley's personal effects were found in Howson's possession. It also stated the following:

> During the investigation, several cellular devices were secured from Howson, French and Bonnell. With statements provided to Investigators it was discovered Howson, French and Bonnell spoke amongst each other and others via phone calls, text messaging, Facebook and other social media accounts before, during and after the murder of LaValley.

Two weeks later, a grand jury indicted Bonnell for first-degree premeditated murder, *see* Minn. Stat. § 609.185(a)(1), and first-degree intentional murder while committing a felony (aggravated robbery), *see* Minn. Stat. § 609.185(a)(3).

In March 2019, Facebook complied with the warrant and provided copies of all 12 Facebook accounts. During his review of Howson's Facebook accounts, the officer found a self-portrait photograph (aka "a selfie") of Howson, French, Bonnell, and LaValley that was taken the day before the murder. During the review of French's Facebook account, the officer discovered digital copies of messages that Bonnell sent from his Pineapple Man Facebook account to French, which were received and stored in French's Facebook

8

account.[3]  As relevant here, French received the following messages from the Pineapple Man Facebook account:

*January 2 and January 4, 2019*

- A message asking French whether anything happened between French and a man named K.

- A message that said, "I know if I loose another person I'ma go on a rampage."

- A screenshot of an image (sent through Facebook) from Pineapple Man to an unknown man with a picture of Bonnell holding a gun with a caption that said, "Better stop texting my chick before you get dropped b****."

- A message that said, "Diff between me and other n*****s il actually do what I say I'm gonna do."

- A message that said, "I'm having the worst day . . . I just really wanna shoot someone."

- A message that said, "I don't even wanna be alive . . . I'm a terrible person."

*January 5, 2019* (the day before the murder)

- A message that said, "[LaValley] has a punchable face."[4]

- A message that said, "Ight I'm down I still wanna pop him."[5]

---

[3]    Bonnell does not contend that he had an ownership interest in French's Facebook account or any of the devices on which her account was stored.

[4]    This message was a response to several messages sent from French's Facebook account to the Pineapple Man Facebook account.  French initially sent messages that read, "I have someone your gonna wanna take care of . . . Who goes by the name [LaValley's nickname]," and then sent a message that included a screenshot of an image (sent through Facebook) of French and LaValley together.

[5]    This message was a response to messages sent from French's Facebook account to the Pineapple Man Facebook account, which read, "Trust me . . . we can . . . take his s***

- A message that said, "Why not take him out now I can do it it's not hard."[6]

- A message that said, "He [LaValley] knows to much I gotta take him out . . . I need to take a video of me shooting [LaValley] to send to my crew there killers they love this s*** . . . I'm shooting him anyway your not gonna tell me I'm not.  You tell me no il shoot him right here."

- A message that said, "No I'm shooting someone tonight he knows too much . . . I need you to find a spot we can go to dump."[7]

- A message that said, "Damn ight well I'm capping him tonight."[8]

*January 6, 2019* (the day of the murder)

- A message that said, "I didn't do it for payment I did it cause I love you."

During the officer's review, the officer discovered digital copies of the electronic messages listed above stored in both French's and Bonnell's Facebook accounts.[9]

In June 2019, Bonnell's attorney informed the district court that the defense had no omnibus issues and that Bonnell wished to enter not guilty pleas to all the charges.  Based on defense counsel's statements, the district court made a record of "the entry of not guilty

---

n send him out without a beating or with one depending on how he reacts and what he says."

[6]     This message was a response to messages sent from French's Facebook account to the Pineapple Man Facebook account, which read, "Not yet tonight we scare him our next move is annihilation and we gotta plan that out."

[7]     This message was a response to messages sent from French's Facebook account to the Pineapple Man Facebook account, which read, "It's not a good time yet besides i have a plan that will make him wish you did shoot him."

[8]     "Capping" can be used as a colloquial term for "shooting."

[9]     Because the officer obtained records containing copies of French's and Bonnell's Facebook accounts at the same time, the information obtained during the review of Bonnell's Facebook accounts could not have been used to justify the request for the warrant to search French's Facebook account.

10

plea[s] and the waiver of any omnibus issues." Three months later, in September 2019, Bonnell entered a guilty plea to first-degree intentional murder while committing a felony (aggravated robbery). Bonnell subsequently filed a postconviction petition, alleging that the factual basis for his guilty plea was inaccurate. The district court denied the postconviction petition. In December 2022, we reversed the district court's order and remanded for trial on the charges pending when Bonnell pleaded guilty. *See Bonnell v. State*, 984 N.W.2d 224, 231 (Minn. 2022) (holding that "the evidence in the plea colloquy record is inadequate to show that Bonnell 'cause[d] the death' of LaValley 'while committing . . . aggravated robbery' " (alteration in original) (quoting Minn. Stat. § 609.185(a)(3))). Concurrently, Howson and French pleaded guilty and were convicted of second-degree intentional murder in connection with LaValley's death under an aiding and abetting theory of criminal liability. *See* Minn. Stat. § 609.19, subd. 1(1) (second-degree intentional murder); Minn. Stat. § 609.05, subd. 1 (aiding and abetting liability).

In May 2023, Bonnell filed a motion to reopen the omnibus hearing. His motion listed nine different issues that he sought to litigate at the hearing, including suppression of "any information obtained as a result of the February 12, 2019, Search Warrant for Facebook data as the warrant lacks specificity."

The district court granted Bonnell's motion and held a contested omnibus hearing in September 2023. When the district court asked defense counsel to identify the issues that would be litigated at the hearing, defense counsel made a general reference to the issues raised in the May 2023 motion to reopen the omnibus hearing. The State called several witnesses. In addition, the parties stipulated to the admission of several documents,

including the search warrant application, the search warrant, and the officer's "receipt, inventory and return" form, in which the officer averred that he obtained, pursuant to the search warrant, records containing copies of all five of the relevant Facebook accounts in March 2019. After all the evidence was presented, the parties agreed to submit their arguments in writing.

In October 2023, Bonnell filed his written argument.[10] As part of Bonnell's argument, defense counsel wrote, "At issue is the validity of the search warrant for *Mr. Bonnell's Facebook records* and whether probable cause was established to support the warrant." (Emphasis added.) In describing the State's burden, defense counsel wrote, "The State must therefore prove the following: (1) [the officer's] affidavit established probable cause to seize all of the data on *Mr. Bonnell's Facebook accounts*, and (2) the authorization for the extraction of the data was sufficiently particular to limit the area subject to search and the items subject to seizure." (Emphasis added.)

On the issue of particularity, defense counsel argued, "[T]he warrant allowed officers to search *Mr. Bonnell's two Facebook accounts* without providing any time frame. It also allowed officers to conduct a wholesale review of everything and anything on

---

[10] As part of his written argument, Bonnell erroneously asked the district court to "suppress" the "search warrant." The legal principle underlying Fourth Amendment suppression motions is "a 'prudential' doctrine that requires the suppression of illegally obtained *evidence*." *State v. Malecha*, 3 N.W.3d 566, 572 (Minn. 2024) (emphasis added) (quoting *Davis v. United States*, 564 U.S. 229, 236 (2011)). Search warrants that lack particularity are not "suppressed," instead they are deemed "invalid." *State v. Hannuksela*, 452 N.W.2d 668, 672–73 (Minn. 1990) (concluding that the search warrant was "invalid" because it lacked particularity); *see also State v. Miller*, 666 N.W.2d 703, 711–13 (Minn. 2003) (concluding that the language of the warrant was sufficiently particular and therefore rejecting appellant's claim that the search warrant was "invalid").

12

*Mr. Bonnell's Facebook accounts*." (Emphases added.) In summarizing his particularity argument, defense counsel wrote, "The failure to place or observe any limits on the search or seizure of data from *Mr. Bonnell's Facebook accounts* independently requires suppression of all evidence obtained during the search." (Emphasis added.) Bonnell's written argument never acknowledged, much less addressed, the issue of whether the searches of his accomplice's Facebook accounts triggered *Bonnell's* Fourth Amendment protections. Instead, defense counsel simply included a single sentence in the concluding paragraph of his written argument, which read, "The wholesale review of the twelve Facebook accounts—and specifically Mr. Bonnell's two (2) Facebook accounts—violated the Fourth Amendment of the United States Constitution and Article I, Section 10 of the Minnesota Constitution."

In November 2023, the State filed its written argument. The State argued that despite Bonnell's assertion to the contrary, the language of the warrant established probable cause and was sufficiently particular to justify the searches of Bonnell's two Facebook accounts. The State also observed that Bonnell lacked standing to challenge the searches of the Facebook accounts owned by French and Howson because he made "no showing of a reasonable expectation of privacy in another person's social media account."

In March 2024, the district court denied Bonnell's suppression motion. On the issue of probable cause, it stated, "Considering the totality of the circumstances as it relates to the Bonnell Facebook accounts, the Application for Search Warrant establishes a sufficient nexus between the property to be searched—Bonnell's Facebook account—and the crime that was under investigation at the time—an apparent homicide." On the issue of

13

particularity, the court wrote, "Considering the totality of the circumstances, giving deference to the issuing judge, and considering the stage of the investigation, a more precise description of the information to be obtained from Bonnell's Facebook data would not be available in this instance." The court did not discuss the searches of the accomplice's Facebook accounts, which is not surprising because Bonnell's written argument can reasonably be read as narrowing the focus of his argument to the searches of Bonnell's two Facebook accounts. Bonnell did not file a motion for reconsideration challenging the scope of the district court's analysis.

In April 2024, the State filed a motion in limine seeking to admit evidence of Bonnell's prior bad acts—as described in Facebook messages from Bonnell stored in French's Facebook account—under the immediate episode and *Spreigl* exceptions to Minnesota Rule of Evidence 404(b)(1). Bonnell argued the evidence of his prior bad acts was inadmissible. On April 26, 2024, the district court granted the State's motion, concluding that the evidence was admissible under both exceptions.

After the district court granted the State's motion in limine, the case proceeded to trial. At the jury trial, French testified that she personally witnessed Bonnell fatally shoot LaValley twice in the face. During her testimony, the State introduced messages between French's and Bonnell's Facebook accounts as trial exhibits.[11] Each exhibit included a chart with the date, time, and contents of electronic messages Bonnell sent to French that were received and stored in her Facebook account, along with copies of the relevant messages

---

[11] Complete copies of the Facebook records obtained from the accounts owned by Bonnell, French, and Howson were also admitted as trial exhibits.

14

from French's Facebook account.[12] Howson also testified about the facts surrounding the murder. During his testimony, the State introduced the photograph of Howson, French, Bonnell, and LaValley that was taken the day before the murder, along with copies of the relevant messages from Howson's Facebook account. Officers also testified about their investigation, and the State introduced an exhibit of a call Bonnell made from jail in which Bonnell says he needs to delete the Pineapple Man Facebook account. In total, three trial exhibits were admitted that consisted of Facebook records obtained exclusively from Bonnell's two Facebook accounts. Finally, BCA firearms and DNA analysts testified about the results of their testing.

In its closing argument, the State focused on the messages sent from Bonnell's Pineapple Man Facebook account to French's Facebook account, arguing that Bonnell was planning to kill LaValley that night, that he had a motive to kill LaValley for flirting with his girlfriend, and that Bonnell, French, and Howson made a concrete plan for the murder through Facebook messages. In contrast, defense counsel argued that the Facebook messages showed that French was "an absolutely wickedly manipulative person who craves attention and wants to feel like she can control the people in her life," and that the plan was "to scare Mr. LaValley—perhaps beat him up and leave him somewhere without his car." Defense counsel also argued that the testimony of French and Howson was not

---

[12] The exhibits also contained copies of the relevant pages from the records obtained from Bonnell's Facebook account. Although the electronic messages were identical, they appeared on different pages of the records obtained from the accounts owned by French and Bonnell.

credible, that Bonnell never walked down the Mesabi Trail, and that Howson was the actual shooter.

On the charge of first-degree premeditated murder, the jury was instructed on both principal and aiding and abetting theories of criminal liability. The jury found Bonnell guilty as charged. The district court convicted Bonnell of first-degree premeditated murder and sentenced him to life in prison without the possibility of release.[13]

This direct appeal follows.

## ANALYSIS

We begin our analysis by addressing an issue of first impression, specifically whether a sender of an electronic message retains a reasonable expectation of privacy in the digital copy of the received message that is stored in the recipient's separate and independent account or device. Next, we determine whether the searches of French's and other individuals' Facebook accounts triggered Bonnell's Fourth Amendment and state constitutional protections after the messages Bonnell sent were received and stored in the recipient's account or device. Then, we consider whether the searches of Bonnell's two Facebook accounts violated his Fourth Amendment and state constitutional protections based on his assertion that the searches of his accounts were conducted pursuant to a warrant that was not sufficiently particular, and if so, whether the district court's admission

---

[13] On the charge of first-degree murder while committing or attempting to commit a kidnapping, the jury was also instructed on both principal and aiding and abetting theories of criminal liability. Although the jury found Bonnell guilty of this charge and the district court entered a conviction, the district court later vacated the conviction in accordance with Minn. Stat. § 609.04 (precluding adjudications of conviction for lesser included offenses), in light of *State v. Pflepsen*, 590 N.W.2d 759, 765–67 (Minn. 1999).

16

at trial of the digital messages and data collected during the searches was harmless beyond a reasonable doubt.

We also consider whether the district court abused its discretion by admitting, under the immediate episode and *Spreigl* exceptions to Minnesota Rule of Evidence 404(b)(1), constitutionally obtained Facebook messages that described Bonnell's prior bad acts, and if so, whether the erroneous admission of the evidence was harmless beyond a reasonable doubt.

Finally, we consider whether, when viewed in a light most favorable to the verdict, the corroborative evidence was weighty enough to restore confidence in the truth of French's direct eyewitness testimony that she saw Bonnell shoot LaValley, and if the State presented sufficient evidence to support Bonnell's conviction.

I.

Bonnell contends that the sender of an electronic message retains a reasonable expectation of privacy under the Fourth Amendment in the digital copy of the received message that is stored in the recipient's separate and independent account or device. This is an issue of first impression for our court.

The protections of the Fourth Amendment are "personal right[s]" that may be invoked when an individual "personally has an expectation of privacy *in the place searched*" and that "expectation is reasonable." *In re Welfare of B.R.K.*, 658 N.W.2d 565, 571 (Minn. 2003) (emphasis added). In *State v. Perkins*, we explained that the Fourth Amendment's "protections are *not triggered* unless an individual has a legitimate expectation of privacy *in the invaded space*." 588 N.W.2d 491, 492 (Minn. 1999)

17

(emphases added).  Put differently, "a defendant who cannot demonstrate a legitimate expectation of privacy relating to the *area searched . . .* may not contest the legality of the search or seizure."  *State v. Carter*, 596 N.W.2d 654, 658 (Minn. 1999) (emphasis added).

Although we have never considered the issue presented, other state and federal courts have addressed the issue.  For example, in *State v. Patino*, the Rhode Island Supreme Court concluded that the sender of a text message does not have a reasonable expectation of privacy in the digital copy of a text message contained on the recipient's device because after the message is received by the recipient, the sender can no longer control what the recipient does with the message.  93 A.3d 40, 56–57 (R.I. 2014).  Similarly, in *Guest v. Leis*, the Sixth Circuit concluded that an email sender loses a legitimate expectation of privacy in an email that has already reached its recipient because at that moment, "the e-mailer would be analogous to a letter-writer, whose 'expectation of privacy ordinarily terminates upon delivery' of the letter."  255 F.3d 325, 333 (6th Cir. 2001) (quoting *United States v. King*, 55 F.3d 1193, 1196 (6th Cir. 1995)).

The reasoning in *Patino* and *Guest* is consistent with the rule that the federal circuit courts of appeal have uniformly applied to physical letters.  For example, in *United States v. Dunning*, the First Circuit concluded that "if a letter is sent to another, the sender's expectation of privacy ordinarily terminates upon delivery."  312 F.3d 528, 531 (1st Cir. 2002) (citations omitted); *see also United States v. Gordon*, 168 F.3d 1222, 1228 (10th Cir. 1999); *King*, 55 F.3d at 1196; *United States v. Knoll*, 16 F.3d 1313, 1321 (2d Cir. 1994); *Ray v. U.S. Dep't of Just.*, 658 F.2d 608, 611 (8th Cir. 1981).

We agree that when an electronic message or physical letter is received by the recipient, the sender no longer has a reasonable expectation of privacy in the message or letter because the sender cannot control what the recipient does with the message or letter. Consequently, we conclude that the sender of an electronic message does not retain a reasonable expectation of privacy in the digital copy of the received message that is stored in the recipient's separate and independent account or device.[14]

In urging us to adopt a different rule of law, Bonnell cites to obiter dicta in *Carpenter v. United States*, 585 U.S. 296, 319 (2018). *Carpenter* "present[ed] the question whether the Government conducts a search under the Fourth Amendment when it accesses historical cell phone records that provide a comprehensive chronicle of the user's past movements," *id.* at 300, and held that "[t]he Government's acquisition of the cell-site records here was a search under th[e] [Fourth] Amendment," *id.* at 320. In that case, Justice Kennedy remarked in dissent that the third-party doctrine "may not apply when the Government obtains the modern-day equivalents of an individual's own 'papers' or 'effects,' " when held by a third party. *Id.* at 332 (Kennedy, J., dissenting). The *Carpenter* majority

---

[14]    In support of his view, Bonnell cites several federal and state cases that involved a search of the *defendant's* Facebook account, device, or computer. *See, e.g.*, *United States v. Zelaya-Veliz*, 94 F.4th 321, 333 (4th Cir.), *cert. denied*, 145 S. Ct. 571 (2024) (holding that the defendants had standing to challenge the searches of Facebook accounts that *belonged to them*, while observing that defense counsel conceded that appellants lacked standing to challenge the searches of Facebook accounts "belonging to two co-conspirators who [were] not parties in this appeal"); *People v. Joly*, 970 N.W.2d 426, 429 (Mich. Ct. App. 2021) (involving a search of the *defendant's* tablet computer which contained an email that the defendant had sent to his attorney); *State v. Jereczek*, 961 N.W.2d 70, 72 (Wis. Ct. App. 2021) (involving a search of the *defendant's* family computer). Bonnell's reliance on these cases is misplaced because they do not involve searches of separate and independent accounts or devices belonging to the recipient of the electronic message.

19

acknowledged that Justice Kennedy's position would be a "sensible exception" to the third-party doctrine. *Id.* at 319. Bonnell's reliance on *Carpenter* is misplaced for two reasons.

First, we are not bound by a dissent nor by the obiter dicta in the majority. *Sheehy Lee v. Kalis*, 19 N.W.3d. 186, 193 n.9 (Minn. 2025) (explaining that "obiter dicta" is generally "considered to be expressions in a court's opinion which go beyond the facts before the court and therefore are the individual views of the author of the opinion and not binding in subsequent cases") (citation omitted) (internal quotation marks omitted); *City of Duluth v. Wendling*, 237 N.W.2d 79, 82 (Minn. 1975) (explaining that we were not bound by dicta in *Heller v. New York*, 413 U.S. 483 (1973)). Neither the exception proposed by Justice Kennedy in dissent, nor its passing reference by the majority, is binding here.[15]

Second, the type of third party contemplated by Kennedy in proposing his exception was an intermediary handling messages in transit such as a mail carrier or an internet company that provides email accounts, not the end recipient of a message as is the case here. *Carpenter*, 585 U.S. at 332 (Kennedy, J., dissenting) (*citing Ex parte Jackson*, 96 U.S. 727, 733 (1878) (letters held by mail carrier) and *United States v. Warshak*, 631 F.3d 266, 283–88 (6th Cir. 2010) (personal emails held by the defendant's internet service provider)). In sum, the non-binding dissent and obiter dicta in *Carpenter* does not

---

[15] The majority in *Carpenter* was clear that its "decision today is a narrow one" and that it did "not express a view on matters not before us." *Carpenter*, 585 U.S. at 316. And the issue before the Supreme Court in *Carpenter* involved "a detailed log of a person's movements over several years," *id.* at 319, not the modern-day equivalent of a person's "papers" or "effects." Thus, the majority opinion's statement regarding Justice Kennedy's proposed exception is obiter dicta because it went beyond the facts before the Court and was not necessary or essential to the Court's analysis.

support Bonnell's claim that the sender of an electronic message retains a reasonable expectation of privacy in the digital copy of the received message that is stored in the recipient's separate and independent account or device.

Because the rule adopted in *Patino* and *Guest* is sound and the caselaw cited by Bonnell does not call that rule of law into question or support a different rule of law, we hold that the sender of an electronic message does not retain a reasonable expectation of privacy in the digital copy of the received message that is stored in the recipient's separate and independent account or device.

## II.

Next, we apply the newly articulated rule of law to the facts of Bonnell's case. Bonnell sent electronic Facebook messages to French and Howson that were received and stored in French's and Howson's Facebook accounts. Bonnell does not claim that he had any ownership interest in French's and Howson's Facebook accounts, or that he has any other claim to privilege in his communications with French or Howson. Moreover, under the newly articulated rule of law, Bonnell did not retain a reasonable expectation of privacy in the digital copy of the received messages that were stored in French's and Howson's separate and independent accounts or devices. Consequently, the searches of French's and Howson's separate and independent Facebook accounts did not trigger Bonnell's Fourth Amendment or state constitutional protections.

## III.

Next, we consider Bonnell's argument that the searches of *his two Facebook accounts* violated his Fourth Amendment protections because the warrant authorizing the

21

searches of his two accounts lacked particularity and was therefore invalid. The State argues that the warrant was valid because it was sufficiently particular, and therefore the searches of Bonnell's two Facebook accounts did not violate his Fourth Amendment protections.

Both the Fourth Amendment of the United States Constitution and article I, section 10, of the Minnesota Constitution require that a search warrant describe the evidence to be seized with particularity. This particularity requirement "prohibits law enforcement from engaging in general or exploratory searches." *State v. Bradford*, 618 N.W.2d 782, 795 (Minn. 2000). "If a search is conducted pursuant to a warrant that is not particular—in other words, does not adequately describe the places or things to be searched with specificity—the search is unconstitutional." *State v. Zielinski*, 10 N.W.3d 1, 21 n.9 (Minn. 2024). Determining whether a warrant is sufficiently particular requires a "case-by-case examination." *State v. Sardina-Padilla*, 7 N.W.3d 585, 601 (Minn. 2024). In conducting this analysis, we consider "the circumstances of the case . . . , as well as the nature of the crime under investigation and whether a more precise description is possible under the circumstances." *State v. Miller*, 666 N.W.2d 703, 713 (Minn. 2003).

When reviewing the denial of a pretrial motion to suppress evidence, "we review the district court's factual findings for clear error and its legal determinations de novo." *State v. Leonard*, 943 N.W.2d 149, 155 (Minn. 2020). "Under the de novo standard, we do not defer to the analysis of the courts below, but instead we exercise independent review." *Wheeler v. State*, 909 N.W.2d 558, 563 (Minn. 2018).

Bonnell contends that the warrant authorizing the searches of his two Facebook accounts was invalid because it lacked particularity as to both subject-matter and time limitations. We address his particularity arguments in turn.

When a search warrant seeks to search an electronic account or device, the subject matter is defined by the scope and type of data that the investigators would like to access. *See Sardina-Padilla*, 7 N.W.3d at 600 (noting that the subject matter of the search warrant at issue was the defendant's entire Facebook account). Here, the warrant authorizing the searches of Bonnell's two Facebook accounts sought "[a]ll contact information," "[a]ll Photos or videos," "[a]ll Neoprints, including profile contact information," "[a]ll activity logs," "[a]ll other records of communications made or received by the users or between users," and "[a]ll IP logs." Critically, the warrant was not subject to any temporal limitations. In other words, the warrant authorized access to the entirety of both of Bonnell's Facebook accounts.

In *Sardina-Padilla*, we "addressed whether a warrant authorizing a search of all content on a social media account for a limited time period meets minimal constitutional requirements for particularity." *Id.* at 599. In that case, officers applied for a warrant to search "[a]ll content" of two Facebook accounts associated with Sardina-Padilla for an approximately three-month period. *Id.* at 591. Although we concluded that the warrant in *Sardina-Padilla* was valid based on its temporal limitation, we said "that the portion of the warrant authorizing law enforcement to search '[a]ll content' associated with Sardina-Padilla's Facebook accounts—standing on its own [without a temporal limitation]—would be 'clearly impermissible.' " *Id.* at 599. We also stated that "[a] warrant permitting a broad

23

search can be sufficiently particular if greater specificity is not possible *because officers do not know all the circumstances* surrounding the alleged crime." *Id.* (emphasis added). "A warrant which describes things in broad or generic terms may be valid 'when the description is as specific as the circumstances and the nature of the activity under investigation permit.'" *State v. Hannuksela*, 452 N.W.2d 668, 674 (Minn. 1990) (quoting *United States v. Santarelli*, 778 F.2d 609, 614 (11th Cir. 1985)).

Here, it cannot be said that a search of all information and messages from Bonnell's two Facebook accounts is "as specific" as it could be. In *Hannuksela*, the extent of the police's knowledge of the crime was "that [the subject of the warrant] was the victim of foul play and that appellant was involved." *Id.* We therefore upheld a somewhat vague warrant because it specifically described searching personal property that might contain items belonging to the victim. *Id.* In contrast, the warrant authorizing the searches of Bonnell's two Facebook accounts was not tailored to, for example, messages shared between Bonnell and the co-conspirators in the crime, which would be likely to show evidence of a crime. *See State v. Harris*, 589 N.W.2d 782, 788 (Minn. 1999) (stating that "probable cause to search exists [if] . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place" (citation omitted) (internal quotation marks omitted)).

The Eleventh Circuit—in a case that we affirmatively cited in *Sardina-Padilla*, 7 N.W.3d at 601—considered whether a warrant authorizing access to all of the defendant's Facebook data was sufficiently particular. *United States v. Blake*, 868 F.3d 960, 974

(11th Cir. 2017).[16]  The Eleventh Circuit concluded that the warrant was invalid, noting that if the police had wanted to make the warrant sufficiently particular, "[w]ith respect to private instant messages, for example, the warrants could have limited the request to messages sent to or from persons suspected at that time of being prostitutes or customers." *Id.*  A similar subject-matter limitation applies here.

In the Fourth Circuit—in a case discussed by both parties—the court upheld a search warrant seeking "all private communications" from Facebook accounts that belonged to the appellants.  *United States v. Zelaya-Veliz*, 94 F.4th 321, 337 (4th Cir.), *cert. denied*, 145 S. Ct. 571 (2024).  But that case is materially distinguishable because the warrants at issue were two-step warrants:  "while the warrants authorized the government to search all of the information disclosed by Facebook, they only permitted the *subsequent seizure* of the fruits, evidence, or instrumentalities of violations of enumerated federal statutes."  *Id.* (emphasis added).  Here, by contrast, the warrant authorizing the search of Bonnell's two Facebook accounts was a one-step warrant that allowed the officer to both search and seize

---

[16]    As here, the search warrant in *Blake*

required Facebook to "disclose" to the government virtually every type of data that could be located in a Facebook account, including every private instant message Moore had ever sent or received, every IP address she had ever logged in from, every photograph she had ever uploaded or been "tagged" in, every private or public group she had ever been a member of, every search on the website she had ever conducted, and every purchase she had ever made through "Facebook Marketplace," as well as her entire contact list.

868 F.3d at 966–67 (footnotes omitted).

25

all data in Bonnell's two Facebook accounts.[17]  The warrant application did not tailor its search to data or messages that would be likely to show Bonnell's participation in LaValley's murder or another violation of Minnesota law.

We have stated, however, "that a temporal limitation may make a warrant sufficiently particular, even if the authorized search is otherwise broad as to subject matter." *Sardina-Padilla*, 7 N.W.3d at 600.  Bonnell points out that the warrant authorizing the searches of his two Facebook accounts lacked any temporal limitations, while the State asserts that the undefined timeframe was necessary to establish that Bonnell owned the Pineapple Man account.  In *Sardina-Padilla*, we cautiously upheld the warrant but noted that the "warrant's broad scope raises a close question." *Id.* at 602.  Our decision to uphold the warrant in that case hinged in large part on the temporal qualifier, which limited the search to data generated within a three-month period.  *Id.*  We also affirmatively cited a case from the United States District Court for the District of Minnesota, which upheld a warrant that was tailored to " 'a specified, fairly narrow period of time close' to the alleged criminal activity." *Id.* at 600 (quoting *United States v. Charles*, No. 16-065 (JNE/FLN), 2016 WL 5939333, at *3 (D. Minn. Oct. 12, 2016), *aff'd* 895 F.3d 560 (8th Cir. 2018)).

Here, there is no temporal limitation.  The warrant authorizing the searches of Bonnell's two Facebook accounts allowed the collection of information from the moment the accounts were created until the warrants were issued, a span of many years.  But at the time they sought the warrant, officers had already interviewed French and Howson and

---

[17]    Indeed, the entirety of Bonnell's Facebook account data—more than 8,000 pages—was entered into evidence as a court exhibit at trial.

thus had some sense of the events leading up to LaValley's murder. The warrant application stated that the officer knew from French's initial interview that the incident precipitating the murder had occurred when LaValley tried to physically touch French at the apartment on January 5, 2019. Because officers must be "as specific as the circumstances and the nature of the activity under investigation permit," *Hannuksela*, 452 N.W.2d at 674, they should have tailored the application to the weeks leading up to the murder—to ascertain whether there was any evidence of intent or planning—to the date when Bonnell and his co-conspirators were arrested and thus no longer had access to their accounts.[18]

The warrant authorizing the searches of Bonnell's two Facebook accounts goes far beyond the three-month temporal limitation in *Sardina-Padilla* and lacks any subject matter or time limitations to meet the particularity requirement. 7 N.W.3d at 602 ("[A] search warrant permitting police to seize '[a]ll content' associated with a social media account for a period of almost three months comes 'perilously close to violating the requirement of particularity.' ").

---

[18] To the extent that the State argues that law enforcement should be able to seek a broader search warrant for the purposes of establishing foundation and authenticity of the ownership of a social media account, we disagree. In *State v. Zanter*, the police sought three search warrants for the defendant's home, each time seeking to do additional forensic testing in the house that they had not performed during the preceding searches. 535 N.W.2d 624, 628–29 (Minn. 1995). In finding that the third and final search warrant lacked probable cause, we wrote, "the police failed to provide the issuing judge *with sufficient new information* that could have led the judge to conclude that a fair probability existed that other enumerated items not discovered during the two previous, exhaustive searches of the Zanter home would now be discovered during a third search." *Id.* at 634 (emphasis added). Therefore, if the police receive data from a properly tailored search warrant and discover that it is insufficient to establish the authenticity of the account, police must seek another warrant to broaden the scope.

Therefore, we conclude that the searches of Bonnell's two Facebook accounts violated his Fourth Amendment and state constitutional protections because the searches were conducted pursuant to a warrant that lacked particularity and therefore was invalid. Because the searches of Bonnell's two Facebook accounts violated his constitutional protections against unlawful searches, the district court erred when it denied Bonnell's motion to suppress the evidence obtained during the two searches, and when it later admitted at trial exhibits containing the pages from Bonnell's two Facebook accounts.[19]

---

[19] Bonnell also argues that the Facebook searches were unconstitutional because the evidence was derived from Bonnell's provision of his phone number during the interview with the special agents in the squad car. Officers asked for Bonnell's phone number within the first four minutes of the interview, and Bonnell provided it without reluctance. During the interview, officers also learned that Bonnell had recently turned eighteen, and that he did not have a high school diploma or a GED. After Bonnell stated numerous times that he lived with his mother and wanted to call her, one of the officers told Bonnell that he did not need to talk to his mother because he was an adult. Bonnell argues that the interview was unduly coercive, and the results of the interview should be suppressed as fruit of the poisonous tree. *See Wong Sun v. United States*, 371 U.S. 471, 487–88 (1963) (explaining derivative evidence is entitled to suppression as "fruit of the poisonous tree" if "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint."). Because we conclude that the search of Bonnell's Facebook accounts violated Fourth Amendment and state constitutional protections based on a lack of particularity, we do not consider Bonnell's alternative argument.

Similarly, Bonnell argues for the first time on appeal that the admission into evidence of the portion of his squad car interview where he provided the agents with his phone number was error and was entitled to suppression. Because the evidence was unobjected-to, we review the district court's decision for plain error. *See State v. Griller*, 583 N.W.2d 736, 740 (Minn. 1998). Under plain error review, the appellant must show (1) error, (2) that is plain, and (3) that affects the appellant's substantial rights. *Id*. An error affects a defendant's substantial rights if there is a reasonable likelihood that it had a significant effect on the jury's verdict. *Id*. at 741. Having carefully reviewed the record, we conclude there is sufficient admissible evidence tying Bonnell to LaValley's death, and the recording entered into evidence of Bonnell providing his phone number to law

We turn now to the issue of whether the district court committed harmful error when it failed to suppress the evidence obtained during the unconstitutional searches of Bonnell's two Facebook accounts and when it later admitted at trial exhibits containing messages from those accounts. "When an error implicates a constitutional right, we will award a new trial unless the error is harmless beyond a reasonable doubt." *State v. Davis*, 820 N.W.2d 525, 533 (Minn. 2012). "An error is harmless beyond a reasonable doubt if the jury's verdict was 'surely unattributable' to the error." *Id.* (citation omitted). In considering whether erroneously admitted evidence is harmless beyond a reasonable doubt, we have said, "[i]mproperly admitted evidence is harmless . . . when the evidence is cumulative." *State v. McDonald-Richards*, 840 N.W.2d 9, 19 (Minn. 2013). Other relevant factors include "the manner in which the evidence was presented, whether it was highly persuasive, whether it was used in closing argument, and whether it was effectively countered by the defendant." *Id.* (citation omitted) (internal quotation marks omitted). Although overwhelming evidence of guilt is also an important consideration, a court cannot focus on the evidence of guilt alone. *Id.*

Here, the Facebook messages that were obtained as a result of the seizure of Bonnell's two Facebook accounts and included in the challenged trial exhibits are

---

enforcement is unlikely to have had a significant effect on the verdict of the jury. Thus, even if the district court committed plain error in admitting this evidence, the error did not affect Bonnell's substantial rights, and he is not entitled to any relief based on this alleged error. *See State v. Patterson*, 587 N.W.2d 45, 52 (Minn. 1998) (explaining that a court will not reverse a conviction based on unobjected-to error unless the appellant shows all three prongs of the plain error test are met).

undoubtedly cumulative. Each of those exhibits also included duplicative records obtained from French's Facebook account containing identical information to that obtained from Bonnell's Facebook accounts. Consequently, the jury's verdict was surely unattributable to the erroneous admission of Bonnell's Facebook messages as part of these exhibits, and therefore the error was harmless beyond a reasonable doubt.

This does not end our analysis, however, because the district court admitted three additional trial exhibits that consisted entirely of Facebook records obtained *only* in the unconstitutional seizure of Bonnell's two Facebook accounts. We conclude that the jury's verdict was surely unattributable to the admission of these records, for the following reasons.

The manner in which these three exhibits were presented suggests that the jury would not have unduly focused on the evidence. One of the exhibits was used to establish the dates, times, and duration of calls to the Pineapple Man account during the State's case. Because the exhibit was referenced infrequently and not in the State's opening statement or closing argument, it was unlikely to be a focus for the jury. The State partially relied on the other two exhibits to establish Bonnell as the owner of the Pineapple Man Facebook account in its opening statement, direct examinations, and closing argument. Referring to one of the exhibits at closing, which included pictures of Bonnell, the State explained that the photos "are of Mr. Bonnell and Mr. Bonnell only" and thus establish him as the owner of the Pineapple Man account. The State also cited to the other exhibit at closing, which included verified phone number data, to explain that "the phone number tied to Pineapple Man's Facebook account . . . [was] [i]n that same recorded statement" that he gave to

30

officers in the squad car. While referenced in closing argument, the State presented multiple additional pieces of evidence linking Bonnell to the Pineapple Man account and thus these two exhibits were unlikely to pull the jury's focus.

Furthermore, the information in these three exhibits was cumulative to the vast amount of evidence tying Bonnell to the crime. There were numerous incriminating Facebook messages derived from French's account that we have determined were admissible at trial, including multiple messages from Bonnell to French saying that he wanted to shoot LaValley, messages describing a plan for where to take LaValley's body, and messages after the murder indicating that Bonnell committed the crime because of his love for French. Moreover, DNA matching Bonnell's profile was found on the magazine and trigger of the murder weapon, and police found bullets in Bonnell's bedroom that were fired by the same gun as the murder weapon. Suppressing the messages and data derived from Bonnell's account would not obviate the incriminatory nature of the other admissible evidence. Moreover, any persuasive value in these three exhibits was likewise undermined by the overwhelming evidence of guilt.

We also observe that defense counsel generally countered during opening statements and closing arguments that information from the Facebook accounts should be considered less persuasive than the physical evidence.

Ultimately, of the three exhibits that came exclusively from Bonnell's two Facebook accounts, the two exhibits referenced in opening and closing provided information duplicative from other admissible trial evidence, and the third exhibit was not a focus of the State's case. On this record, we conclude that the jury's verdict was surely

31

unattributable to the erroneous admission of these three additional exhibits, and therefore the error was harmless beyond a reasonable doubt.[20]

V.

Next we consider Bonnell's argument that the district court committed reversible error when it admitted into evidence, under the immediate episode and *Spreigl* exceptions to Minnesota Rule of Evidence 404(b)(1), constitutionally obtained Facebook messages contained in French's account that described Bonnell's prior bad acts. The State argues that the district court did not err because the challenged messages satisfied both the immediate episode and *Spreigl* exceptions to Rule 404(b).[21]

Minnesota Rule of Evidence 404(b)(1) generally prohibits the admission of "[e]vidence of another crime, wrong, or act . . . to prove the character of a person in order to show action in conformity therewith." As relevant here, there are two exceptions to this general prohibition. First, evidence of a prior bad act is admissible as immediate-episode evidence "where two or more [crimes, wrongs, or acts] are linked together in point of time or circumstances so that one cannot be fully shown without proving the other." *State v. Wofford*, 114 N.W.2d 267, 271 (Minn. 1962). Evidence of a prior bad act satisfies the immediate episode exception if "there is a close causal and temporal connection between

---

[20]    Because we find that the error was harmless, we do not address the State's arguments that the messages would have been inevitably discovered in the recipients' accounts or that the good-faith exception to the exclusionary rule should apply.

[21]    In one of the challenged messages, Bonnell identifies himself as "Deshon Bonnell." This message does not constitute an "act," much less a prior bad act, because it is simply a message of identification. It therefore does not fall within the purview of Minnesota Rule of Evidence 404(b)(1) and need not satisfy the immediate episode or *Spreigl* exceptions.

the prior bad act and the charged crime." *State v. Riddley*, 776 N.W.2d 419, 425 (Minn. 2009). Second, under the *Spreigl* exception, evidence of past crimes may be admissible when relevant to show motive, intent, absence of mistake, identity, or a common scheme or plan. *State v. Gomez*, 721 N.W.2d 871, 877 (Minn. 2006) (citing *State v. Spreigl*, 139 N.W.2d 167 (Minn. 1965)).

We review a district court's evidentiary rulings for an abuse of discretion. *State v. Kennedy*, 585 N.W.2d 385, 389 (Minn. 1998). "A defendant appealing the admission of evidence has the burden to show the admission was both erroneous and prejudicial." *Riddley*, 776 N.W.2d at 424.

Bonnell argues the district court erred in admitting the following messages sent from the Pineapple Man Facebook account and received and stored in French's Facebook account between January 2 and January 4, 2019, a few days before LaValley's murder:

- A message asking French whether anything happened between French and a man named K.

- A message saying "I know if I loose another person I'ma go on a rampage."

- A screenshot of an image (sent through Facebook) from Pineapple Man to an unknown man with a picture of Bonnell holding a gun with a caption that said, "Better stop texting my chick before you get dropped b****."

- A message that said, "I'm having the worst day . . . I just really wanna shoot someone."

- A message that said, "I don't even wanna be alive . . . I'm a terrible person."

Assuming without deciding that the district court abused its discretion when it admitted the challenged statements under the immediate episode and *Spreigl* exceptions to

Minnesota Rule of Evidence 404(b)(1), we conclude that Bonnell failed to satisfy his burden to show that the erroneous admission of the challenged statements was prejudicial.

To demonstrate prejudice, a defendant must show that "there is a reasonable possibility that the wrongfully admitted evidence significantly affected the verdict." *State v. Bigbear*, 10 N.W.3d 48, 54 (Minn. 2024) (citation omitted) (internal quotation marks omitted); *see also State v. Fardan*, 773 N.W.2d 303, 320 (Minn. 2009) ("To warrant a new trial, the erroneous admission of *Spreigl* evidence must create a reasonable possibility that the wrongfully admitted evidence significantly affected the verdict." (citation omitted) (internal quotation marks omitted)). We have previously identified a list of nonexclusive factors that may be considered in determining whether the defendant has satisfied his burden of demonstrating prejudice, including "(1) the manner in which the party presented the evidence, (2) whether the evidence was highly persuasive, (3) whether the party who offered the evidence used it in closing argument, and (4) whether the defense effectively countered the evidence." *Bigbear*, 10 N.W.3d at 54. In addition, "[s]trong evidence of guilt undermines the persuasive value of wrongly admitted evidence." *Id.* (quoting *State v. Smith*, 940 N.W.2d 497, 505 (Minn. 2020)). These factors may not be relevant or persuasive in every case because determining whether the defendant satisfied his burden is a "fact-specific" analysis. *Id.* at 55.

Here, the challenged messages were read into the record by a police officer. The challenged messages were not highly persuasive because their persuasive value was undermined by the large amount of other admissible evidence that established Bonnell's ownership of the Pineapple Man account, his participation in the crime, his relationship to

the crime, and his desire to hurt LaValley. The prosecutor referenced the challenged messages twice in his closing argument. Defense counsel countered the challenged messages in his closing argument by telling the jury, "We saw several [messages] in which there was a *discussion about shooting these guys* and of course, *it never happened*. This was an eighteen-year-old kid at the time, Mr. Bonnell. He has *a new girlfriend*. He's trying to *impress and to appear to be a big tough guy* and she loved it." (Emphases added.) Based on the specific facts of this case, we conclude that Bonnell failed to show that there is a reasonable possibility that the wrongfully admitted evidence significantly affected the verdict, especially when the challenged messages were outweighed by the strong evidence of guilt from other admissible evidence establishing Bonnell as the owner of the Pineapple Man account, demonstrating Bonnell's participation in and relationship to the crime, and his motivation to hurt LaValley.

In sum, even assuming that the district court abused its discretion when it admitted the challenged messages under the immediate episode and *Spreigl* exceptions to Minnesota Rule of Evidence 404(b), we conclude that Bonnell failed to show there is a reasonable possibility that the wrongfully admitted evidence significantly affected the verdict.

VI.

Finally, we consider Bonnell's argument that there was insufficient evidence to support his conviction because the State presented only accomplice testimony and circumstantial evidence.[22] This presents two intertwined issues. First, we must consider

---

[22] There is no dispute that French is an accomplice whose testimony requires corroboration under Minn. Stat. § 634.04.

35

whether the corroborative evidence, when viewed in a light most favorable to the verdict, was weighty enough to restore confidence in the truth of French's eyewitness testimony that Bonnell fatally shot LaValley such that it can be considered as part of our examination of the sufficiency of the State's evidence. *See State v. Ford*, 539 N.W.2d 214, 225 (Minn. 1995). Second, we must consider whether the State presented sufficient evidence to support Bonnell's conviction.

We first consider whether the presented evidence was weighty enough to corroborate French's testimony. Pursuant to Minnesota Statutes section 634.04,

> [a] conviction cannot be had upon the testimony of an accomplice, unless it is corroborated by such other evidence as tends to convict the defendant of the commission of the offense, and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof.

Minn. Stat. § 634.04. A witness is an accomplice if the witness "could have been indicted and convicted for the crime with which the defendant is charged." *State v. Pendelton*, 759 N.W.2d 900, 907 (Minn. 2009) (citation omitted) (internal quotation marks omitted). In such circumstances, corroboration of the accomplice's testimony is required to sustain a conviction. "The rationale for this rule is that the credibility of an accomplice is inherently untrustworthy." *State v. Evans*, 756 N.W.2d 854, 877 (Minn. 2008). Evidence to corroborate accomplice testimony is sufficient "when it is weighty enough to restore confidence in the truth of the accomplice's testimony." *State v. Gilleylen*, 993 N.W.2d 266, 282 (Minn. 2023) (citation omitted) (internal quotation marks omitted). But accomplice testimony "does not need to be corroborated on every point or element of the crime." *Id.* (citation omitted) (internal quotation marks omitted). The corroboration is complete when

a defendant is linked to the alleged crime with evidence that "affirm[s] the truth of the accomplice's testimony and point[s] to the guilt of the defendant in some substantial degree." *Id.* at 281 (citation omitted). The corroborating evidence may consist of physical evidence associated with the crime, the testimony of eyewitnesses and experts at trial, and suspicious and unexplained conduct of an accused before or after the crime. *State v. Pederson*, 614 N.W.2d 724, 732 (Minn. 2000); *State v. Mathiasen*, 127 N.W.2d 534, 539 (Minn. 1964). Moreover, the corroborating evidence may be direct or circumstantial. *State v. Thoresen*, 921 N.W.2d 547, 551–52 (Minn. 2019); *State v. Rasmussen*, 63 N.W.2d 1, 3 (Minn. 1954) (explaining that circumstantial evidence may be sufficient to corroborate the testimony of an accomplice).

The sufficiency requirement for corroborating evidence is less stringent than the sufficiency requirement for sustaining a conviction. *State v. Clark*, 755 N.W.2d 241, 253–54 (Minn. 2008) ("The precise quantum of corroborative evidence needed necessarily depends on the circumstances of each case, but corroborative evidence does not need to be sufficient to . . . sustain a conviction." (citation omitted) (internal quotation marks omitted)). Consequently, the circumstantial evidence analysis that we apply in determining whether the circumstances proved are sufficient to support a conviction does not govern our review of whether the corroborating evidence is weighty enough to restore confidence in the truth of the accomplice's testimony. Instead, we simply view circumstantial evidence corroborating an accomplice's testimony in the light most favorable to the verdict. *Ford*, 539 N.W.2d at 225; *State v. Pippitt*, 645 N.W.2d 87, 93 (stating that we "view corroborative evidence in the light most favorable to the verdict").

French testified that Bonnell shot LaValley. Here, the following physical evidence and expert testimony corroborates French's testimony and establishes Bonnell's involvement in the crime: LaValley was shot twice in the face with a .22 Ruger pistol; DNA matching Bonnell's profile was found on the pistol used in the crime; and a bullet casing found at the scene matched both the pistol and other bullet casings found in Bonnell's bedroom. In addition, the following evidence from before the murder is incriminating: Bonnell converses with French on Facebook about where to take LaValley to dispose of him; and Bonnell messages French repeatedly about how he is going to shoot LaValley and film the killing. After the murder, the following activity is suspicious: Bonnell messages French, "I didn't do it for payment I did it cause I love you"; and Bonnell says on a jail call that he needs to delete his Pineapple Man Facebook account. Viewed in the light most favorable to the verdict, the above-described evidence is weighty enough to restore confidence in the truth of French's eyewitness testimony that Bonnell brought his pistol to the scene and fatally shot LaValley.

Having concluded the evidence corroborates French's eyewitness testimony, we turn to whether the State presented sufficient direct evidence, including French's testimony, to support Bonnell's conviction. Direct evidence is "[e]vidence that is based on personal knowledge or observation and that, if true, proves a fact without inference or presumption." *See State v. Clark*, 739 N.W.2d 412, 421 n.4 (Minn. 2007) (citation omitted). When a disputed element is proven by direct evidence, we apply the traditional standard of review. *State v. Horst*, 880 N.W.2d 24, 39 (Minn. 2016). "Under the traditional standard, we limit our review to a 'painstaking analysis of the record to determine whether the evidence, when

viewed in a light most favorable to the conviction, was sufficient to permit the jurors to reach the verdict which they did.' " *Id.* at 40 (quoting *State v. Webb*, 440 N.W.2d 426, 430 (Minn. 1989)).

Here, French testified, based on her personal knowledge and observations, that Bonnell brought his pistol to the scene and fatally shot LaValley twice in the face on Mesabi Trail. Moreover, the statements Bonnell made in the messages that he sent French provide direct evidence that he intentionally fired the shots with premeditation. Viewed in a light most favorable to the conviction, this direct evidence was sufficient to permit the jurors to find Bonnell guilty of first-degree premeditated murder. Consequently, we conclude that the State presented sufficient evidence to support Bonnell's conviction.

## CONCLUSION

For the foregoing reasons, we affirm the decision of the district court.

Affirmed.